**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF PUERTO RICO**

UNITED STATES OF AMERICA,

      **Plaintiff,**

          v.                  **CRIMINAL NO. 22-242 (RAM)**

[2] CESAR PEPIN-AMARANTE,

      **Defendant.**

<u>**OPINION AND ORDER**</u>

RAÚL M. ARIAS-MARXUACH, United States District Judge

    Pending before the Court is Defendant Cesar Pepin-Amarante's ("Defendant" or "Mr. Pepin-Amarante") *Motion to Set Aside Magistrate Judge's Detention Order and/or Request for De Novo Hearing* ("*Motion*"). (Docket No. 86). For the reasons set forth below, the Court **DENIES** Defendant's *Motion*. Mr. Pepin-Amarante shall remain detained pending trial.

**I.   BACKGROUND**

    On June 1, 2022, a Grand Jury indicted Mr. Pepin-Amarante on six counts:

1. Conspiracy to Import Cocaine in violation of 21 U.S.C. §§ 952(a), 960, 963 ("Count 1");

2. Attempted Importation of Cocaine in violation of 21 U.S.C. §§ 952(a), 960 and 18 U.S.C. § 2 ("Count 2");

3. Conspiracy to Possess with Intent to Distribute a

Controlled Substance Aboard a Vessel Subject to the Jurisdiction of the United States in violation of 46 U.S.C. §§ 70503(a)(1) and 70506(b) and 21 U.S.C. § 960(b)(1)(B) ("Count 3");

4. Possession with Intent to Distribute a Controlled Substance Aboard a Vessel Subject to the Jurisdiction of the United States in violation of 46 U.S.C. § 70503(a)(1), 21 U.S.C. § 960(b)(1)(B), and 18 U.S.C. § 2 ("Count 4");

5. Conspiracy to Possess with Intent to Distribute Controlled Substances in violation of 21 U.S.C. §§ 841(a)(1), (b)(1)(A)(ii), and 846 ("Count 5");

6. Attempted Possession with Intent to Distribute a Controlled Substance in violation of 21 U.S.C. §§ 841(a)(1) and (b)(1)(A)(ii) and 18 U.S.C. § 2 ("Count 6"); and

(Docket No. 6).

Defendant and Co-defendants are accused of attempting to "negotiate and coordinate a maritime drug venture of approximately 550 kilograms of cocaine that [would] be dispatched from Venezuela and imported into PR."[1] (Docket No. 3-1 ¶ 7). Defendants allegedly planned to purchase 50 kilograms of that shipment and to keep

---

[1] Consideration of the affidavit does not raise evidentiary concerns, as "[t]he rules concerning the admissibility of evidence in criminal trials do not apply to the presentation and consideration of information at the [detention] hearing." 18 U.S.C. § 3142(f)(2)(B).

another 84 kilograms as payment for their transportation services. Id. ¶ 12.

On June 5, 2022, the U.S. Probation Office submitted a pretrial services report on Defendant, which suggested conditions to assure Defendant's appearance and the safety of the community. (Docket No. 19). On June 6, 2022, Magistrate Judge Bruce McGiverin held the detention hearing. (Docket No. 26). Defense counsel argued in favor of setting conditions for release while the Government moved for detention. Id. The Magistrate Judge held the matter under advisement. Id. On June 13, 2022, the Magistrate Judge issued an *Order of Detention Pending Trial*. (Docket No. 39). He found that the offenses charged created a rebuttable presumption under 18 U.S.C. § 3142(e)(3) and that Defendant had not introduced sufficient evidence to rebut that presumption. Id. at 2. The Magistrate Judge concluded that the Government proved by a preponderance of the evidence that no conditions of release would reasonably assure Defendant's appearance as required. Id. The Court's reasons for detention included:

1. The strong weight of the evidence against Defendant;

2. The fact that Defendant would be subject to a lengthy period of incarceration if convicted;

3. His significant family or other ties outside of the United States;

4. The nature of the charged offenses; and

  5. Defendant's supposedly unaccounted for
     wealth.

Id. at 2-3.

On December 16, 2022, Defendant filed the present *Motion* seeking *de novo* review of his detention order (Docket No. 86). This Court granted a *de novo* detention hearing, which was held on January 11, 2023. (Docket Nos. 87 and 93). The Government proceeded by proffer and argued that Defendant should remain in custody pending trial. (Docket No. 93). Defendant argues that the nature and circumstances of the offenses, the weight of the evidence, his personal history and characteristics, and the level of danger he poses to the community all weigh in favor of release. (Docket No. 86). The Court took the matter under advisement. (Docket No. 93).

After considering the evidence, the Court finds that the Government has proven under the relevant standards of proof that there are no conditions of release which can reasonably assure the safety of any person and the community and Defendant's appearance as required. Therefore, Mr. Pepin-Amarante shall remain detained pending trial. Nothing in this *Opinion and Order* should be read as affecting Defendant's presumption of innocence. *See* 18 U.S.C. § 3142(j).

## II.  LEGAL STANDARD

### A. <u>Standard of review for a detention or release order</u>

A district court reviews a magistrate judge's order of detention or release under a *de novo* standard and "need not defer to the magistrate judge's findings or give specific reasons for rejecting them." <u>United States v. Cidraz-Santiago</u>, 18 F. Supp. 3d 124, 126 (D.P.R. 2014) (citations omitted). A district court may also "take additional evidence or conduct a new evidentiary hearing" when "the defendant has placed relevant facts at issue." <u>Id.</u>

### B. <u>The Bail Reform Act</u>

Pursuant to the Bail Reform Act of 1984 (the "Act"), a judicial officer must determine whether a person charged with an offense shall be detained or released pending trial. *See* 18 U.S.C. § 3142(a). Section 3142(e) of the Act provides that if, after conducting a hearing, "the judicial officer finds that no condition or combination of conditions will reasonably assure the appearance of the person as required and the safety of any other person and the community, such judicial officer shall order the detention of the person before trial." 18 U.S.C. § 3142(e).

#### 1. Standard of proof

The standard of proof for detention on the grounds of dangerousness is **clear and convincing evidence**. <u>Id.</u> § 3142(f) (emphasis added). Clear and convincing evidence is "more than

preponderance of the evidence but less than beyond a reasonable doubt." United States v. Acevedo-Ramos, 600 F. Supp. 501, 509 (D.P.R. 1984) (citations omitted). This standard requires "a high degree of certainty that the information presented supports the conclusion of dangerousness or risk to the obstruction of justice." Id. On the other hand, the standard of proof for detention on the grounds of risk of flight is preponderance of the evidence. *See* United States v. Patriarca, 948 F.2d 789, 793 (1st Cir. 1991).

### 2. Factors the Court must consider

18 U.S.C. § 3142(g) sets forth the factors judicial officers must consider when determining whether there are conditions of release that assure a defendant's appearance and the safety of the community. These factors are: (1) the nature and circumstances of the offense charged; (2) the weight of the evidence against the defendant; (3) the defendant's personal history and characteristics; and (4) the nature and seriousness of the danger to any person or the community that would be posed by the defendant's release. *See* 18 U.S.C. § 3142(g).

### 3. The 18 U.S.C. § 3142(e) presumption

18 U.S.C. § 3142(e) creates a rebuttable presumption that no conditions can reasonably assure the appearance of the defendant and the safety of the community where there is probable cause that a defendant has committed one of the crimes listed in the statute or in the other circumstances set forth therein. *See* United States

v. Vargas-Reyes, 220 F. Supp. 3d 221, 225 (D.P.R. 2016) (citing 18 U.S.C. § 3142(e)(3)). A grand jury indictment alone suffices to trigger the presumption. Id. (citing, inter alia, United States v. Vargas, 804 F.2d 157, 163 (1st Cir. 1986)).

In the case of drug trafficking crimes, the presumption comes from "Congress's findings that drug traffickers often have the resources and foreign contacts to escape to other countries" and that "[f]orfeiture of even a large bond may be just a cost of doing business, . . . hence drug traffickers pose special flight risks." United States v. Palmer-Contreras, 835 F.2d 15, 17 (1st Cir. 1987); see also United States v. Jessup, 757 F.2d 378, 385 (1st Cir. 1985), partially abrogated on other grounds by United States v. O'Brien, 895 F.2d 810 (1st Cir. 1990); United States v. Perez-Franco, 839 F.2d 867, 870 (1st Cir. 1988); United States v. Dillon, 938 F.2d 1412, 1416-17 (1st Cir. 1991).

Once triggered, the 18 U.S.C. § 3142(e)(3) presumption imposes on the defendant a burden of production. See Vargas-Reyes, 220 F. Supp. at 225. The defendant may satisfy this burden of production by introducing at least some evidence contrary to the facts presumed. Id. For that reason, "[t]he burden is not heavy." Id. Notably, the burden of persuasion always rests with the Government in both presumption and non-presumption cases. Id.

However, the 18 U.S.C. § 3142(e)(3) presumption does not simply vanish once a defendant has produced some evidence. See

Palmer-Contreras, 835 F.2d at 18; Jessup, 757 F.2d at 383-84, 387.
Instead, judges must keep the presumption in mind as an additional
factor to the four listed in Section 3142(g). *See* Palmer-Contreras,
835 F.2d at 18; Jessup, 757 F.2d at 383-84, 387. In drug
trafficking cases, the weight afforded to the presumption depends
on how closely the defendant resembles the paradigmatic drug
trafficker for whom the risk of flight is particularly high; "the
less those features resemble the congressional paradigm, the less
weight the [court] will likely give to Congress's concern for
flight." Jessup, 757 F.2d at 387; *see also* Palmer-Contreras, 835
F.2d at 18; Perez-Franco, 839 F.2d at 870.

### III. DISCUSSION

#### A. **The nature and circumstances of the offense charged**

Mr. Pepin-Amarante was indicted on six counts of drug
trafficking crimes. (Docket No. 6). The offenses charged in the
indictment are serious. If convicted, Defendant will be facing a
mandatory minimum sentence that exceeds 10 years. Given the
severity of the alleged offenses and the punishment prescribed by
the relevant statutes, this factor clearly favors detention.

#### B. **The weight of the evidence against Defendant**

The weight of the evidence against Defendant is strong and
weighs in favor of detention. The undercover agent reportedly met
with Defendant and one of his Co-defendants, Mr. Montero-Perez, on
multiple occasions between April and May 2022 to discuss the drug

deal. (Docket No. 3-1 ¶ 7). The Government asserts that all conversations between the undercover agent, Mr. Pepin-Amarante, and Mr. Montero-Perez were recorded. (Docket No. 46 at 10).

Defendant argues that, although he can be identified on the recordings, Mr. Montero-Perez initiated and maintained the discussions with the undercover agent. (Docket No. 86 at 6). He also states that the Government has no other evidence against him. Id. at 6-7. The Court is not persuaded by Defendant's argument that the evidence against him is weaker simply because he spoke less than his Co-defendant.

Mr. Pepin-Amarante also cites two Sixth Circuit cases that say this factor goes to the weight of the evidence of dangerousness, not to the weight of the evidence of a defendant's guilt. Id. at 6. Not all circuits follow this model, though. The First Circuit assesses the weight of the evidence **of the defendant's guilt**. *See, e.g.,* United States v. Tortora, 922 F.2d 880, 884 (1st Cir. 1990); Patriarca, 948 F.2d at 792. In United States v. Zhang, the Second Circuit explained how the strength of the evidence **that the defendant committed the charged offense** is an appropriate consideration in assessing the defendant's flight risk and the danger he poses to the community. *See* 55 F.4th 141, 152 (2d Cir. 2022) ("a preliminary assessment of the strength or the weakness of the evidence can be a key consideration in whether the defendant is dangerous or poses a flight risk, and such a

finding does not in fact impinge upon the presumption of innocence").

## C. **Defendant's personal history and characteristics**

There are some aspects of Defendant's personal history and characteristics favorable to him, but this factor still weighs in favor of detention pending trial.

### 1. **Aspects of Defendant's personal history and characteristics that weigh in favor of release**

Defendant has no reported mental health or substance abuse issues. (Docket No. 86 at 6). He has no criminal record, although Defendants allegedly told the undercover agent that they had successfully coordinated the transportation of drugs into Puerto Rico for about six years.[2] Id.; (Docket No. 3-1 ¶ 8). Defendant has family ties to Puerto Rico. He has lived in Puerto Rico since 1998 and became a naturalized United States citizen in 2018. (Docket Nos. 86 at 7; 19 at 2). His mother, stepfather, and two siblings, all of whom he is purportedly close with, live in Puerto Rico. (Docket No. 86 at 7). It is worth nothing, though, that one of these siblings, Bryant Nieves-Amarante, is a Co-defendant in the instant case. (Docket No. 19 at 1). He also has a consensual partner, Jennifer Garcia Rodriguez, in Puerto Rico. (Docket No. 19 at 2). They have been together since 2008 and share two young

---

[2] Courts may consider uncharged conduct in assessing a defendant's dangerousness. See United States v. Rodriguez, 950 F.2d 85, 88-89 (2d Cir. 1991).

children. Id. She is willing to serve as Mr. Pepin-Amarante's
Third-Party Custodian. (Docket No 86 at 16). However, the fact
that they lived together when Defendant allegedly committed these
offenses casts doubt on her ability to adequately supervise him,
especially if she works while he stays home due to his illness.
Id. at 11.

### 2. Paradigmatic case for which the 18 U.S.C. § 3142(e)(3) presumption was crafted

Though some aspects of his personal history are favorable to
him, Mr. Pepin-Amarante fits the paradigmatic drug trafficking
case that Congress had in mind when it crafted the 18 U.S.C. §
3142(e)(3) presumption against release.

First, this case involves a large amount of cocaine. Based on
recorded conversations with the undercover agent, Defendant
allegedly sought to transport 550 kilograms of cocaine from
Venezuela to Puerto Rico. (Docket No. 3-1 ¶¶ 7, 12). He purportedly
planned to keep 84 kilograms of that shipment as payment for his
transportation of the drugs, and to purchase 50 additional
kilograms from the undercover agent. Id. The special agent's
affidavit states that at the time it was written on May 15, 2022,
the amount of cocaine that Defendants planned to keep for
themselves (134 kilograms) was worth an estimated street value of
at least $2.01 million USD. Id. ¶ 15. The agent stated that based
on her experience, 134 kilograms of cocaine "is indicative of

wholesale distribution and not for personal use." Id. According to
the Government, the value of the total amount of cocaine Defendant
planned to traffic is about eight million USD in Puerto Rico.
(Docket No. 46 at 7).

Furthermore, courts consider what role the defendant played
in the criminal venture. See United States v Alonso, 832 F. Supp.
503, 507 (D.P.R. 1993); United States v. Beeks, 2005 WL 1940014,
at *4 (S.D. Ind. 2005). The special agent's affidavit states that
Mr. Pepin-Amarante and Mr. Montero-Perez are allegedly "**leaders** of
the Transnational Criminal Organization that have successfully
coordinated the transportation and importation of narcotics into
Puerto Rico for approximately six years." (Docket No. 3-1 ¶ 8
(emphasis added)). The affidavit also claims that Mr. Pepin-
Amarante and Mr. Montero-Perez are "**in charge** of recruiting boat
captains in the Dominican Republic and St. Martin to conduct
maritime drug ventures." Id. ¶ 9 (emphasis added). Therefore,
Defendant purportedly played an important leadership role in this
drug trafficking scheme and has international drug trafficking
related contacts.

Defendants' plan was also sophisticated, which suggests that
they were experienced drug traffickers, just as they had allegedly
told the undercover agent. The affidavit states that they had
recruited boat captains to sail from St. Martin to an at-sea
location, where an aircraft would drop the 550 kilograms of

cocaine. Id. ¶ 11. From there, the boat captains would sail to Puerto Rico, where a 15-person receiving crew would pick up the drugs. Id. The crew would later deliver the drugs to the undercover agent. Id.

To pay for the additional 50 kilograms of cocaine, Mr. Pepin-Amarante and Mr. Montero-Perez allegedly met with the undercover agent on May 12, 2022 and paid him $100,000 in cash. Id. ¶ 13. The Government also proffered that Mr. Pepin-Amarante has inexplicable wealth, as evidenced by his 2020 Mercedes. (Docket No. 46 at 9). The Government argues that although the car is on loan and in his partner's name, neither has the income to loan such an expensive car. (Docket No. 27 ¶ 5). Defendants' ability to procure $100,000 in cash and Mr. Pepin-Amarante's expensive car may be indicative of access to resources that make him a greater flight risk. See Palmer-Contreras, 835 F.2d at 17; Jessup, 757 F.2d at 385; Perez-Franco, 839 F.2d at 870; Dillon, 938 F.2d at 1416–17.

Defendant unsuccessfully attempts to compare himself to the defendant in United States v. Giampa, whom the district court released pending trial. See 755 F. Supp. 665 (W.D. Pa. 1990), aff'd, 947 F.2d 938 (3d Cir. 1991). As the court in Giampa reasoned: "Giampa hardly fits the mold of the international narcotics trafficker with whom Congress was most concerned. The record negates any contention that Giampa has either the resources or the contacts that would enable him to flee the country with

ease." Id. at 669. However, Mr. Pepin-Amarante is different from Mr. Giampa in some important respects.

Mr. Pepin-Amarante has more international ties than Mr. Giampa. Mr. Giampa had lived in the Western District of Pennsylvania his entire life. *See* id. Mr. Pepin-Amarante was born in the Dominican Republic. (Docket No. 86 at 7). He became a naturalized citizen of the United States somewhat recently, in 2018. Id. Though he denies having a relationship with them, Mr. Pepin-Amarante's biological father and a third sibling live in the Dominican Republic. Id. In 2018, he traveled to the Dominican Republic with his family for vacations. (Docket No. 19 at 2). Mr. Pepin-Amarante and Mr. Montero-Perez were reportedly "in charge of recruiting boat captains in the Dominican Republic and St. Martin to conduct maritime drug ventures." (Docket No. 3-1 ¶ 9). Defendant is charged with offenses related to **international** drug trafficking. Thus, Mr. Pepin-Amarante has more international ties than Mr. Giampa had.

Furthermore, this case involves a much greater amount of cocaine. In all, 550 kilograms of cocaine were allegedly at stake, and Defendants purportedly paid $100,000 in cash for 50 of those kilograms. (Docket No. 3-1 ¶¶ 7, 13). Mr. Giampa accepted **one** kilogram of cocaine on consignment because he could not afford to pay the informant at the time. *See* Giampa, 755 F. Supp. at 670. It is thus reasonable to conclude that Mr. Pepin-Amarante has more

resources and contacts to flee the country than Mr. Giampa had.
Defendant thus fits the paradigmatic international drug
trafficking case for which Congress crafted the 18 U.S.C. §
3142(e)(3) presumption against release.

### 3. Defendant's Leukemia

Defendant also argues that he should be granted conditioned
release because he has Leukemia. (Docket No. 86 at 10-11). He
claims that he is not receiving adequate treatment in detention
and that his illness puts him at a higher risk of contracting
COVID-19 while detained. Id.

Even in cases involving serious illness or injury, the focus
in bail review proceedings remains on the detainee's flight risk
and level of danger he poses to the community. *See, e.g.,* United
States v. Worrell, 2021 WL 2366934, *13 (D.D.C. 2021) ("At bottom,
defendant's arguments obscure the relevant inquiry—whether
defendant's medical condition or healthcare treatment affect the
legal analysis for pretrial detention."), appeal dismissed, 2021
WL 4765445 (D.C. Cir. 2021); *see also* United States v. Barton,
2020 WL 1974252, at *3 (E.D. La. 2020).

Furthermore, Defendant is not entitled to the exact treatment
that he prefers, as long as he is receiving adequate care. *See,
e.g.,* Worrell, 2021 WL 2366934, at *14 ("Because defendant has
access to adequate care, neither his disagreement with the treating
physicians concerning his medication nor his desire to have access

to a different doctor provide an adequate legal basis for reconsideration of his detention."); United States v. Birbragher, 2008 WL 1883504, at *2 (N.D. Iowa 2008).

Additionally, courts generally focus on the detention center's **capacity** to treat the defendant's illness or injury. For example, in United States v. Scarpa, the court released Mr. Scarpa **on the condition that he be confined to a hospital** because the prison's medical facilities were **unable to provide care** for his terminal AIDS and a gunshot wound that destroyed a portion of his face and skull. *See* 815 F. Supp. 88 (E.D.N.Y. 1993). Similarly, in United States v. Cordero Caraballo, the court granted conditioned release to a defendant **who was partially paraplegic** because the Bureau of Prisons would not accept a patient with open wounds. *See* 185 F. Supp.2d 143 (D.P.R. 2002). Not only did these defendants have complex treatment plans the detention centers could not administer, but their mobility was also severely limited, which made them less of a flight risk and danger to the community. Mr. Pepin-Amarante keeps his Leukemia stable with a simple pill regimen that any detention center should be able to administer. (Docket No. 86 at 10). He does not purport to have limited mobility due to his illness. In fact, Mr. Pepin-Amarante already had Leukemia when he allegedly committed these offenses, which quashes any argument that his disease limits his mobility or makes him less dangerous to the community.

Defendant's situation is akin to that of the defendant in United States v. Hammond, 2016 WL 7384175 (W.D. Pa. 2016). In that case, the district court held the defendant in detention despite his cancer because he could continue his doctor's treatment plan in custody in light of the Marshals Service's approval of "all oncology appointments and treatments for the duration of Defendant's custody." 2016 WL 7384175, at *4; *see also* United States v. Parker, 517 F. Supp. 2d 375, 376-77 (D.D.C. 2007) (denying pretrial release to a defendant who "can receive the medical treatment he requires while detained at the Correctional Treatment Facility"). The court in Birbragher, even denied a defendant's request for release to have gallbladder surgery, reasoning that he could have it performed through the Bureau of Prisons. *See* 2008 WL 1883504, at *1-2. Thus, having cancer, on its own, is insufficient to warrant pretrial release if the detention center has the capacity to provide adequate treatment. In this case, there is no reason that Defendant cannot receive his pill regimen in detention.

This is not to say that courts cast a blind eye on allegations of inadequate medical care. In United States v. Johnston, for example, the court released a defendant **for 21 days** so that he could get an urgent diagnosis and treatment plan for his cancer. *See* 2017 WL 4277140, at *9 (D.D.C. 2017). The defendant had been diagnosed with colon cancer while in custody, and additional

testing was necessary to determine how advanced the cancer was and what treatment was necessary. Id. at *5. The court was concerned about the "significant delays" in scheduling the required referrals, follow-up appointments, and surgery. Id.; see also United States v. Adams, 2019 WL 3037042 (D. Or. 2019).

However, these cases involved a greater sense of urgency to diagnose and prescribe a treatment plan for the defendant than exists here. Mr. Pepin-Amarante was diagnosed in 2018. (Docket No. 86 at 10). He is "currently stable on prescribed medications." (Docket No. 102-1 at 3). The medical notes for his October 6, 2022 hematology consult state that Defendant's Leukemia is "well managed with Ibrutinib."[3] Id. Thus, Defendant's case does not seem as urgent as the case of the defendants in Johnston and Adams. The Court does not mean to minimize the seriousness of Defendant's allegations regarding his cancer treatment in detention. However, Defendant's medical summary does not support his claims of inadequate care. If appropriate, he may pursue other legal remedies in relation to those allegations. See United States v. Loera, 2017 WL 3098257, at *27 (D.N.M. 2017) ("The general rule . . . is that a defendant must file a separate civil action to challenge his conditions of confinement."); see also United States v. Martinez-Hernandez, 2015 WL 6133050, *7 (D.P.R. 2015).

---

[3] The Court notes that the October 6, 2022 note says, "Recommendation was to 'continue with the same management and follow up with labs in 2 months[,]'" but the medical summary shows no follow-up labs performed on Defendant.

Nor is Defendant's concern about COVID-19 necessarily determinative of this *Motion*. Courts deciding whether to release a detainee due to COVID-19 consider the detainee's susceptibility to the disease as well as the detention center's COVID-19 statistics and response. *See, e.g.,* <u>United States v. Gandia-Maysonet</u>, 2021 WL 219191, *1 (D.P.R. 2021); <u>United States v. DeBerry</u>, 2020 WL 7395356, at *6 (W.D.N.Y. 2020); <u>United States v. Hahn</u>, 2021 WL 3051867, at *5 (S.D. Ind. 2021). Furthermore, the focus remains on the defendant's flight risk and the level of danger he poses to the community. *See, e.g.,* <u>United States v. Graham</u>, 452 F. Supp. 3d 871, 877 (D. Minn. 2020) ("While the Court is sympathetic to Graham's concerns about the possibility of contracting COVID-19, such concerns have no bearing, much less 'material bearing,' under § 3142(f), on the question of Defendant's risk of flight and the safety of the community, under these facts."), aff'd, 2020 WL 6326339 (8th Cir. 2020).

While Mr. Pepin-Amarante has Leukemia, it is "currently stable on prescribed medications." (Docket No. 102-1 at 3); *see also* <u>United States v. Jones</u>, 2020 WL 1934997, at *6 (S.D.N.Y. 2020) ("The Defendant has not presented evidence that he is at an increased risk because he had Burkitt Lymphoma as a teenager, underwent treatment for that disease, and is currently in remission or has been cured."). Furthermore, Guaynabo MDC, where Defendant is currently detained, has only one confirmed active COVID-19

case.[4] Thus, Mr. Pepin-Amarante's chances of contracting COVID-19 in detention are currently low. Finally, the Court is not convinced that Defendant's current condition makes him any less of a flight risk or danger to the community, especially because Defendant already had Leukemia when he allegedly committed the charged offenses. Therefore, Defendant's illness does not override the fact that his case fits the paradigmatic international drug trafficking case for which the § 3142(e)(3) presumption was crafted. Defendant's personal history and characteristics thus weigh in favor of detention.

D. **The nature and seriousness of the danger to any person or the community that would be posed by the Defendant's release**

The fourth factor does not weigh in favor of release or detention. On the one hand, Mr. Pepin-Amarante has no criminal record. (Docket No. 86 at 6). On the other, Defendant's ability to introduce drugs into the community if released presents a danger to others. *See* United States v. Pina-Aboite, 97 Fed. Appx. 832, 836 (10th Cir. 2004) (citation omitted) ("[T]he risk that a defendant will continue to engage in drug trafficking constitutes a danger to the community."); United States v. Hernandez, 778 F. Supp. 2d 1211, 1230 (D.N.M. 2011). According to the special agent's affidavit, given the quantity of cocaine that Defendants purportedly planned to keep, Mr. Pepin-Amarante may be in the

---

[4]     *See* COVID-19 Cases, Federal Bureau of Prisons, https://www.bop.gov/coronavirus/ (last visited on February 9, 2023).

business of selling cocaine, not just transporting it, which he could do even under home confinement. (Docket No. 3-1 ¶ 15).

Allowing Defendant to return to his address of residence would mean putting him back in the same environment in which he allegedly committed the charged offenses. Furthermore, the Court is not convinced that Defendant's partner would make an appropriate Third-Party Custodian given that she lived with Defendant at the time of the alleged offenses and given that she works during the day while Defendant stays home due to his illness. (Docket No. 86 at 11).

Although the fourth factor does not strongly favor detention, it does not readily rebut the other factors that weigh against release.

### IV.  CONCLUSION

For the foregoing reasons, Mr. Pepin-Amarante's *Motion* is **DENIED.** Defendant shall remain detained pending trial.

**IT IS SO ORDERED.**

In San Juan, Puerto Rico, this 9th day of February 2023.

S/ RAÚL M. ARIAS-MARXUACH
United States District Judge